```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      WESTERN DISTRICT OF OKLAHOMA
 2

 3    ESTATE OF ANTHONY KADE DAVIS, on
      behalf of the deceased, ANTHONY KADE
 4    DAVIS,

 5         Plaintiff,

 6    vs.                        Case No. CIV-17-807-SLP

 7    (1)  THE SHERIFF OF CANADIAN COUNTY,
      a political subdivison, and
 8    (2)  THE BOARD OF COUNTY COMMISSIONERS
      OF CANADIAN COUNTY, a political
 9    subdivision,

10         Defendants.

11              DEPOSITION OF JESSICA ELLISON
                TAKEN ON BEHALF OF THE PLAINTIFF
12        ON OCTOBER 26, 2018, BEGINNING AT 9:02 A.M.
                     IN EL RENO, OKLAHOMA
13

14                         APPEARANCES

15    On behalf of the PLAINTIFF:

16
      J. David Ogle
17    Erika Schwink
      BABBIT, MITCHELL & OGLE
18    9905 S. Pennsylvania Ave.
      Oklahoma City, OK  73159
19    (405) 692-7676
      david@oglelaw.com
20
      On behalf of the DEFENDANT:
21
      Stephen L. Geries
22    COLLINS, ZORN & WAGNER
      429 N.E. 50th Street, Second Floor
23    Oklahoma City, OK  73105
      (405) 524-2070
24    steve@czwglaw.com

25    REPORTED BY:  SUSAN K. McGUIRE, CSR, RPR
```

**EXHIBIT 13**

```
 1   WHEREUPON,

 2                     JESSICA ELLISON

 3   after having been first duly sworn, deposes and says

 4   in reply to the questions propounded as follows,

 5   to-wit:

 6                     DIRECT EXAMINATION

 7   BY MR. OGLE:

 8        Q.   Good morning, Ms. Ellison.

 9        A.   Good morning.

10        Q.   If you would, for purposes of the record,

11   would you state your full name and spell your last

12   name?

13        A.   Jessica Alice Ellison, E-L-L-I-S-O-N.

14        Q.   And could you state your age?

15        A.   34.

16        Q.   And can you tell us where you reside and I

17   don't need the P.O. box?

18        A.   Calumet, Oklahoma.

19        Q.   Calumet, Oklahoma?

20        A.   Uh-huh.

21        Q.   Have you ever been deposed before?

22        A.   No, I have not.

23        Q.   So you've never had to sit in a room or in a

24   courtroom and be taken under oath and asked questions?

25        A.   No, I've not.
```

1    Q.   What training did you receive prior to or

2  while you were employed at the Canadian County

3  Detention Center?

4    A.   I had a lot of training during my time at

5  the Canadian County jail.  We had jail school every

6  year, which would include first aid, policies and

7  procedures, booking, bail bonds, we would do jail

8  standards every year.

9         I also have my training through, I went

10  through the CLEET reserve program while employed

11  there, so I have all of my CLEET training also.  I

12  also had taser and OC spray, CPR.

13    Q.   In your training did there become a time

14  where you would be trained on the policies and

15  procedures of the county jail?

16    A.   Yes, sir.

17    Q.   A prior witness in this matter has already

18  identified this document that is marked as Plaintiff's

19  Exhibit 10, but the Custody, Philosophy of the

20  Canadian County Sheriff's Office and the Detention

21  Center, is that something you would have been familiar

22  with and trained to follow?

23    A.   I would say that we would go over it, yes.

24    Q.   When you say "go over it", would that mean

25  they hand it to you and have you read it in the car,



1    or were you in classroom setting when you would work

2    through the policies and procedures of the operation

3    of the county jail?

4         A.    We are in a classroom setting when we go

5    over it.

6         Q.    Would that be on a bi-annual, an annual, or

7    one time in your employment, how often would you go

8    through the policies and procedures of the Canadian

9    County Detention Center?

10        A.    We are -- we go over it in a classroom

11   setting once a year.  Everyone is issued the policies

12   and procedures to keep with you and there are multiple

13   binders with the policies and procedures throughout

14   the facility.

15        Q.    I think what I'm understanding you to say is

16   you were provided an actual copy and then there were

17   actual copies available to you for your review and

18   inspection, if you so choose, at the detention center

19   as well?

20        A.    Yes, sir.

21        Q.    So I've shown you Exhibit 10, which is

22   Custody, Philosophy.  Would you have gone through

23   Medical Screening as marked as Exhibit 11?

24        A.    Yes, sir.

25        Q.    The Jail Logbook as marked as number 12?



1    the hospital.

2      Q.    In fact, you were at the hospital when he

3   was pronounced dead; correct?

4      A.    Yes, sir.

5      Q.    And it was your obligation to report back to

6   the jail of the determination of death?

7      A.    Yes, sir.

8      Q.    Do you remember interactions that you had

9   with Mr. Davis as you as an employee of the detention

10   center and he as an inmate of the detention center?

11      A.    Yes, I remember interactions.

12      Q.    What can you describe as to an interaction

13   you had in April of 2016 with Mr. Davis?

14      A.    I had an altercation with Mr. Davis.

15      Q.    Can you describe for us, please, that

16   altercation?

17      A.    Mr. Davis had come out of his cell during a

18   lockdown period and one of my officers at the time was

19   having troubles getting him back in the cell, so I

20   assisted. Mr. Davis attempted to put his hands on me

21   and we had to restrain him.

22      Q.    Can you describe how he attempted to put his

23   hands on you?

24      A.    He was trying to push me into a wall.

25      Q.    Was he trying to use his hands to push or



1    was his shoulder, what was he trying to push you with?

2         A.   He was using his hands.

3         Q.   Where was he touching your person?

4         A.   I cannot tell you the exact location.  I

5    know it was my upper body.

6         Q.   And was there another jail staff present

7    with you during that event?

8         A.   Yes, there was.

9         Q.   And who was that, if you remember?

10        A.   Floyd.

11        Q.   And what was done once he tried to, or

12   pushed your upper body?

13        A.   After that it became a hands-on altercation

14   where both myself and Floyd had to restrain him.  We

15   placed him on the ground, it was, he was put on a --

16   he was put on the floor and restrained into hand

17   restraints.  Lieutenant Carmack came in around the end

18   of it and helped us to finish restraining him.

19        Q.   What did you do with him after you

20   restrained him?

21        A.   He was placed in his cell and medical staff

22   was notified to come and check on him.

23        Q.   Was he coherent and verbal during this

24   altercation?

25        A.   Yes, he was.



1          Q.    Was he ultimately hospitalized after this

2    altercation?

3          A.    Not for this altercation.

4          Q.    In the days following this altercation are

5    you aware if he was hospitalized or not hospitalized?

6          A.    I believe I heard that he was

7    hospitalized --

8          Q.    Were you --

9          A.    -- after.

10         Q.    And do you know how much time had passed

11   between the altercation and his hospitalization?

12         A.    I do not.

13         Q.    Were you on duty, or do you have a memory if

14   you were on duty at the time he was taken to the

15   hospital?

16         A.    I do not have memory of him being.

17         Q.    During this time period was the detention

18   center working in eight hour shifts?

19         A.    I am not for sure.

20         Q.    Was there a period of time when you worked

21   at the detention center that they worked in eight hour

22   shifts?

23         A.    Yes, sir.

24         Q.    And I noticed here in the policies and

25   procedures that were provided to me through discovery


Professional Reporters
800.376.1006
www.proreporters.com

1          A.    Have I -- I'm sorry, repeat that.

2          **Q.    Have you in your interactions with Mr. Davis**

3    **ever observed him have an altercation with anyone**

4    **other than the one you've described in April?**

5          A.    Not that I remember.

6          **Q.    Okay.  Did you ever observe Mr. Davis with**

7    **injuries that made him appear differently than he**

8    **appeared in either of the photographs before you in**

9    **Exhibit 1 and 2?**

10         A.    Are you asking if I saw him with any

11   injuries?

12         **Q.    Correct.**

13         A.    He had bruising on the day that, the day of

14   his death he had bruising.

15         **Q.    Where did you observe bruising on him?**

16         A.    I believe it was his leg.

17         **Q.    Was there bruising anywhere else?**

18         A.    To my knowledge, I cannot tell you.

19         **Q.    Do you remember being told by anyone the**

20   **basis or reason that Mr. Davis was being moved from a**

21   **non-observation cell to an observation cell?**

22         A.    Yes, I was told that morning.

23         **Q.    Who told you of the move?**

24         A.    My corporal, Fitzgerald.

25         **Q.    If you can remember, what was it you heard**



**Professional Reporters**
800.376.1006
www.proreporters.com

 1    him tell you, or remember him telling you?

 2         A.   He told me that he was being moved due to

 3    medical observation for unexplained bruising.

 4         Q.   Did he share with you that there was

 5    bruising to Mr. Davis's face that was unexplained?

 6         A.   To my knowledge, I cannot tell you.

 7         Q.   Did he explain to you that there was concern

 8    that he had had seizures?

 9         A.   I cannot tell you that.

10         Q.   So what you do remember is being told that

11    he was being moved for medical observation?

12         A.   Yes, sir.

13         Q.   And you previously described for us what the

14    purpose of medical observation was?

15         A.   Yes, sir.

16         Q.   Okay.  And during the time period that he

17    was moved from cell 9 to cell 11, 11 would be an

18    observation, IDA 11?

19         A.   IDA 11 is an observation cell, yes.

20         Q.   Were you involved in or on duty when he was

21    moved from cell 9 to 11?

22         A.   No, sir.

23         Q.   You weren't involved in that process at all?

24         A.   No, sir.

25         Q.   Going back to the date of June 5th, the date



1    video yet, are you?

2         A.    I am not yet.

3         Q.    We'll watch till you come in just to

4    confirm.

5         A.    That's me.

6         Q.    So you've now come in the screen wearing

7    your brown detention uniform?

8         A.    Yes.

9         Q.    Okay.  I just wanted to confirm we're all on

10   the same information.  All right.  Let's talk about

11   your interactions on June 5 of 2016.  I think we've

12   established that you were on duty from 8:00 to 4:00 on

13   that date?

14        A.    That was the shift, yes.

15        Q.    And you may have had to work a little extra?

16        A.    Yes, I did.

17        Q.    What do you remember being the first thing

18   shared with you or told with you regarding the inmate

19   who is being stored or housed in IDA 11?

20        A.    I was told by Corporal Fitzgerald that he

21   was put into that, that Davis was put in IDA 11 due

22   to, or yeah, he was put in IDA 11 due to medical, by

23   the medical staff due to unexplained bruising on his

24   body.

25        Q.    Did you have any further discussion or share


Professional Reporters
800.376.1006
www.proreporters.com

1    that information or that line of information with any

2    other detention staff on duty, such as Staten or

3    Henderson?

4        A.   I cannot tell you for sure if I -- if like I

5    was the one who told them.  I know that I spoke with

6    them that day.

7        Q.   Was that prior to or after you had

8    interaction with Mr. Davis?

9        A.   It would be after.

10        Q.   After he had passed or when he was still in

11    the cell?

12        A.   I had talked with them while he was in his

13    cell.

14        Q.   All right.  If you could, please describe

15    what you remember being your first interaction with

16    him on the 5th, him being Mr. Davis, excuse me?

17        A.   I went to cell IDA 11 and I opened the door

18    and I spoke with him for a short period of time.

19        Q.   If I may interrupt just for a second.  Was

20    that early in your shift, or at the end of your shift,

21    or do you have a recollection of when that might have

22    occurred?

23        A.   I don't have a recollection of the exact

24    timing.

25        Q.   Would that have been something in the course



 1   of the jail logs or the data entry that you all do

 2   upon visiting with inmates, that would have been

 3   documented?

 4        A.   It could have been, I do not know if it was

 5   or not.

 6        Q.   Do you know if that was in the morning of

 7   the -- because you came on at 8:00, scheduled to be

 8   off at 4:00, was it the morning that you would have

 9   had your first interaction with Davis?

10        A.   I believe it was.

11        Q.   Okay.  I interrupted you, please go ahead

12   and describe your interaction with him.

13        A.   I spoke with him, Mr. Davis, for a short

14   period of time, I asked him if he wanted to put

15   clothes on, I asked him if he was doing okay, I asked

16   him if he needed anything.  And that was the end of

17   it.

18        Q.   Is that an interaction or conversation that

19   you had with him through the bean hole or the food

20   feeding hole or was that with the door open?

21        A.   The door was open.

22        Q.   Was there another guard with you at that

23   time that you would have opened the cell door?

24        A.   There was not one.

25        Q.   Okay.  So on the video we should have you



1      with the door open communicating with Mr. Davis during

2      your shift?

3          A.    Yes.

4          Q.    Okay.  Was he laying down at the time?

5          A.    Yes, he was.

6          Q.    Where in the cell was he laying down, if you

7      remember?

8          A.    I don't remember an exact location, I just

9      know that he was in the floor.

10         Q.    Was he on a mat or off a mat?

11         A.    I cannot tell you.

12         Q.    Was he clothed or unclothed?

13         A.    He was unclothed.

14         Q.    Was it at this time that you observed the

15     bruising you previously described on his person?

16         A.    Yes, it was.

17         Q.    Were you able to visually see his face at

18     this interaction?

19         A.    I cannot tell you.

20         Q.    Was there any fecal matter or signs of

21     defecation at that time of your interaction with

22     Mr. Davis?

23         A.    By memory I cannot tell you.

24         Q.    You weren't there for purposes of feeding or

25     providing medication at that time, were you?



1          A.    Yes, it is.

2                MR. GERIES:  Object to the form.

3          Q.    (BY MR. OGLE)  So that is the same cell?

4          A.    That is IDA 11 cell.

5          Q.    Okay.  Does that help refresh your memory of

6     the position or where Mr. Davis was at the time that

7     you walked into the cell?

8          A.    No, it does not.

9          Q.    Is there any log or reporting system that

10    you're aware of in the detention center that would

11    memorialize how many meals that Mr. Davis had eaten in

12    the last 32 hours?

13         A.    The logbook.

14         Q.    Would that be the control logbook, should be

15    documenting meals?

16         A.    Yes.

17         Q.    What do you do if an inmate is

18    non-responsive to receipt of meals, how is that

19    documented?

20         A.    What do you mean by non-responsive?

21         Q.    They don't eat?

22         A.    If they refuse their meal then it is logged

23    in the logbook.

24         Q.    And if they refuse medication how is it put

25    in?



1      Staten's memory, or Henderson's memory as to what was

2      shared with them regarding why he was in medical

3      observation?

4           A.    Yes, sir.

5           Q.    Do you believe under the policies and

6      procedures that because somebody is under video

7      observation that loosens or reduces the obligation of

8      jail personnel to physically check on inmates?

9               MR. GERIES:  Object to the form.

10              THE WITNESS:  Are you asking my opinion?

11          Q.    (BY MR. OGLE)  I'm asking, yes, your

12     opinion?

13          A.    No.

14          Q.    Okay.  And do you believe that is a policy

15     of the detention center?

16          A.    Policy of the detention center is for them

17     to check on them once an hour, physically.

18          Q.    And is that once an hour for all inmates;

19     correct?

20          A.    Yes, sir.

21          Q.    And then is there a heightened requirement,

22     I think one time you said 15 minutes on suicide

23     observation?

24          A.    On suicide observation it is 15 minutes.

25          Q.    And it's your testimony that medical is less



1    access to go back and watch it?

2        A.    No, they do not.

3        Q.    Has to be a sergeant or up?

4        A.    I believe all of them did, unless they

5    worked with IT.

6        Q.    Okay.  Earlier we talked about meals being

7    logged when they get refused by inmates.  And I

8    believe you said that even if an inmate's not on

9    medical observation any time an inmate refuses a meal

10   that is logged?

11       A.    Yes, it is.

12       Q.    You said earlier it was logged on the

13   control room log, is it also logged in OTIS?

14       A.    Yes, there is a place to log it in OTIS.

15       Q.    And does a jail nurse, does she have access

16   to a control room log when she comes in the control

17   room?

18       A.    Yes, she does.

19       Q.    And does the nurse staff have access to

20   OTIS?

21       A.    There was a program where the nurse could

22   get on to OTIS with it being a read only.  I believe

23   she had access at that time.

24       Q.    Okay.  Also in cell I 11 where Anthony Davis

25   was being housed, there was access for him to water in



1   that cell; correct?

2        A.   Yes, there's a sink above the toilet.

3        Q.   And that sink has a water fountain in it;

4   correct?

5        A.   Yes, it does.

6        Q.   And I just want to be clear, as far as you

7   knew, when Anthony Davis was moved to cell I 11, his

8   observation was with regard to some bruises; correct?

9        A.   Yes, it was.

10        Q.   Were you aware of any other reason why he

11   was being observed during that time period?

12        A.   There was unexplained bruises that could

13   possibly be self-harm, but they did not know.  It was

14   just unexplained bruising.

15        Q.   At the time, you would agree, that Turnkey

16   nurse Miranda Huerta came in and worked on June 5,

17   2016; correct?

18        A.   Yes, she was there that day.

19        Q.   In fact, you said earlier you had

20   conversations with her; correct?

21        A.   I did.

22        Q.   And you had conversations with her about

23   Anthony Davis; correct?

24        A.   Yes, I did.

25        Q.   At any time did she come to you and change


Professional Reporters
800.376.1006
www.proreporters.com

1    the observation for Anthony Davis?

2         A.    No, she did not.

3         Q.    Did she express any additional concerns that

4    Anthony Davis needed additional or different medical

5    care at any time that day?

6         A.    No, she did not.

7         Q.    If she would have told you he needed to go

8    to the hospital, would you have made arrangements to

9    take him to the hospital?

10        A.    Yes.

11        Q.    In fact, would it have been a violation of

12   the jail policy not to take him to the hospital if the

13   jail nurse, or if the Turnkey nurse had mentioned that

14   he needed additional care?

15        A.    It could be criminal, yes.

16        Q.    You were asked some questions earlier about

17   the policies and procedures.  Would it be a violation

18   of the policy of the Canadian County jail not to do

19   physical sight checks every hour?

20        A.    Yes.

21        Q.    And would it be a violation of the policy

22   and procedure of the Canadian County jail not to log

23   sight checks when they took place?

24        A.    Yes.

25        Q.    Would it be a violation of policy and



     1   procedure to skip sight checks?

     2        A.   Yes.

     3        Q.   Would it be a violation of policy and

     4   procedure to withhold or prevent an inmate from

     5   getting needed or necessary medical care?

     6        A.   Yes, that would be a violation.

     7        Q.   And you said also earlier it could be a

     8   criminal violation as well?

     9        A.   Yes, it could be.

    10        Q.   At any time during your shift on June 5,

    11   2016, did you become aware that Anthony Davis had an

    12   emergency medical need?

    13        A.   No, I was not aware of any.

    14             MR. GERIES: Pass the witness.

    15                    REDIRECT EXAMINATION

    16   BY MR. OGLE:

    17        Q.   When was this discussion had with the nurse

    18   on duty, Nurse Huerta?

    19        A.   It would have been during that day sometime.

    20        Q.   You didn't physically or visually observe

    21   her have interaction with Mr. Davis, did you?

    22        A.   No, I did not.

    23        Q.   If the camera reflects that her interaction

    24   with him was at 7:38 a.m. that would have been prior

    25   to your shift; correct?



Professional Reporters
800.376.1006
www.proreporters.com