1     IN THE UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF OKLAHOMA

2

   ESTATE OF ANTHONY KADE DAVIS, on
3   behalf of the deceased, ANTHONY KADE
   DAVIS,
4        Plaintiff,
   vs.                 Case No. CIV-17-807-SLP
5

   (1) THE SHERIFF OF CANADIAN COUNTY,
6   a political subdivision, and
   (2) THE BOARD OF COUNTY COMMISSIONERS
7   OF CANADIAN COUNTY, a political
   subdivision,
8
          Defendants.
9


10

        DEPOSITION OF CALEB STATEN
11      TAKEN ON BEHALF OF THE PLAINTIFF
    ON OCTOBER 17, 2018, BEGINNING AT 9:03 A.M.
12          IN EL RENO, OKLAHOMA

13


14    APPEARANCES

15   On behalf of the PLAINTIFF:

16   J. David Ogle
   BABBIT, MITCHELL & OGLE
17   9905 S. Pennsylvania Ave.
   Oklahoma City, OK 73159
18   (405) 692-7676
   david@oglelaw.com
19

   On behalf of the DEFENDANTS:
20

   Stephen L. Geries
21   COLLINS, ZORN & WAGNER
   429 N.E. 50th Street, Second Floor
22   Oklahoma City, OK 73105
   (405) 524-2070
23   steve@czwglaw.com

24   Also present: Erika Schwink

25   REPORTED BY: Karen Dauphin Albert, CSR, RPR

1                    CALEB ANDREW STATEN,

2    having been first duly sworn, deposes and says in

3    reply to the questions propounded as follows:

4                    DIRECT EXAMINATION

5    BY MR. OGLE:

6        Q    If you would, could you state your full

7    name and date of birth for the record.

8        A    Caleb Andrew Staten, ████ 1990.

9        Q    How are you currently employed?

10       A    Canadian County sheriff's office.

11       Q    How long have you been so employed?

12       A    Four years.

13       Q    So in June of 2016, about one year and

14   nine months, give or take?

15       A    Yes, sir.

16       Q    What do you believe we are here today to

17   do?

18       A    Deposition on Anthony Davis.

19       Q    What do you understand a deposition to

20   be?

21       A    Find answers to proceed to court.

22       Q    You understand and appreciate that the

23   court reporter gave you an oath a few moments

24   ago for your testimony?

25       A    Yes, sir.

1     A    Top.

2     Q    So if I'm reading this sheet right, on

3    Page 2, top right, it's saying that on

4    4/12/2016, at approximately 1:20, he was

5    released on his own recognizance.  Is that

6    correct?

7     A    Yes.

8     Q    Own recognizance being a non-bond event,

9    meaning you don't have to hire a bondsperson or

10    put up cash?

11     A    Yes.

12     Q    Are you aware that he was at the

13    emergency room at the time of this release?

14     A    No.

15     Q    I'm going to show you what, for

16    identification purposes, I'm going to mark or

17    talk about, I guess, as Exhibit 3.

18          MR. OGLE:  Just flip that around.

19          MS. SCHWINK:  (Complies)

20      Q  (By Mr. Ogle) I want to see if you can

21    identify what this is.

22          MR. OGLE:  Push play.

23          MS. SCHWINK:  (Complies)

24     Q    (By Mr. Ogle) What does that appear to

25    be?

1  restraint chair?

2      A   Yes.

3      Q   On what purposes would you use a

4  restraint chair?

5      A   If the inmate is trying to hurt

6  themselves.

7      Q   Is there any period of time or

8  procedures that you are required to follow

9  within a restraint chair?

10     A   Yes.

11     Q   Do you know that off the top of your

12  head?

13     A   Every two hours you are required to give

14  them water, stand them up, move their limbs,

15  make sure there's blood flow, make sure they're

16  hydrated, if they need to use the restroom.

17     Q   Is there certain procedures that have to

18  be done to get approval from supervisors or have

19  them checked out by medical to put them in a

20  restraint chair?

21     A   Yes.

22     Q   Which?  Both?

23         I asked two questions in one, which was

24  poorly worded.

25         Do you have to get approval from a

1    supervisor to put somebody in a restraint chair?

2        A    Yes.

3        Q    Do you have to involve medical personnel

4    to confirm somebody is medically sufficient or

5    okay to go in a restraint chair?

6        A    No.

7        Q    At times are you required to bring in

8    medical to confirm somebody is doing well after

9    being in the chair for two hours?

10        A    No.

11            THE WITNESS:  I need to explain.

12            MR. GERIES:  Oh, go ahead.

13        Q    (By Mr. Ogle) If you would like to add,

14    feel free.

15        A    The supervisor has to be administration,

16    lieutenant or above.

17        Q    So Sergeant Fisher would not be high

18    enough in the food chain?

19        A    He would call Lieutenant --

20        Q    His lieutenant?

21        A    Uh-huh.

22        Q    Fair enough.

23        A    And advise us.

24        Q    Were you ever involved in placing

25    Mr. Davis in a restraint chair?

1    supervisor on property at the detention center,

2    have the opportunity to review these to

3    determine any medical needs that may exist

4    relevant to an inmate?

5        A    Yes.

6        Q    So you have had to look at these before?

7        A    Yes.

8        Q    What is your understanding as to how

9    these are generated?

10       A    At the book-in process.

11       Q    So when a person first comes in the

12   detention center, they've taken this photograph

13   that we've looked at before on Plaintiff's

14   Exhibit Number 2, and sometime in that same time

15   period, they're going to ask questions, medical

16   questions?

17       A    Yes.

18       Q    And they would do this each time

19   somebody is a regular book-in person; correct?

20       A    Any inmate.

21       Q    But if I was there Thursday, I bond out

22   and I come back on Monday, would I do another

23   one of these?

24       A    Yes.

25       Q    Have you ever been present when this



1    occurs?

2        A    Yes.

3        Q    What happens?

4        A    The inmate stands in front of you, and

5    you ask the questions on the list.

6        Q    Is this done on a computer and you are

7    filling in the boxes?

8        A    Yes.  And then you type in answers,

9    also.

10       Q    Okay.  So it's a question and answer on

11   a computer?  It's not a document, that you sit

12   down and hand-write anything out?

13       A    No.  It's computer.

14       Q    Have you ever seen or been on an

15   occasion where you and/or medical personnel

16   would review differing medical questionnaires

17   for the same inmate?  The example of where I

18   bond out or I get booked in on a Tuesday; I bond

19   out on a Wednesday.  So I did a medical

20   questionnaire when I was booked in, and I do a

21   second medical questionnaire when I'm rebooked

22   in on Monday.  So there's two that exist.  Would

23   you ever look at them together?

24       A    No.  Look at the most recent one.

25       Q    Is there under any scenario that you

```
 1       A    I was advised earlier today.

 2       Q    Prior to today, you weren't aware of

 3   that?

 4       A    Correct.

 5       Q    You just noticed that because of the

 6   release sheet that we showed you in one of the

 7   previous exhibits?

 8       A    Yes.

 9       Q    Fair enough.

10            What type of trainings do you remember

11   having within the detention center for detecting

12   seizures?

13       A    From what the nurse advised us they

14   would do or what we would notice.

15       Q    So you don't remember going to any

16   special training where somebody comes in and

17   talks to you for three hours and says, "These

18   are signs and symptoms"?

19       A    No.

20       Q    What training have you had relevant to

21   inmates who may be detoxing from drugs and/or

22   alcohol?

23       A    From what nurses have -- medical has

24   told us to observe if we see these signs and

25   symptoms, alert them.
```



1        Q    What do you believe those signs and

2    symptoms to be?

3        A    If there is sluggishness, like they're

4    still drunk or still intoxicated, you know,

5    slurred speech, things of that nature.

6        Q    Are you familiar with the term DTs?

7        A    Not that I recall right now.

8        Q    Have you ever observed anybody

9    withdrawing from drugs and/or alcohol?

10       A    Yes.

11       Q    What did you observe there?

12       A    A lot of times, talking to people that

13    aren't there, sweating, like not relaxed,

14    walking around, agitated, things of that nature.

15       Q    What is your training and the policies

16    and procedures, at least back in 2016, when you

17    become concerned or aware that an inmate is in a

18    detoxification state?  What do you do?

19       A    Advise a nurse.

20       Q    When is the nurse on shift?

21       A    Currently or in 2016?

22       Q    2016.

23       A    2016, it would have been approximately

24    8:00 to 4:00, 1600.

25       Q    So 8:00 in the morning until



1    approximately 4:00 in the afternoon, a nurse

2    would be on property?

3         A    Yes.

4         Q    So those medical concerns kind of falls

5    to staff outside of those hours; correct?

6         A    You call the nurse.

7         Q    If you observe some issue?

8         A    Uh-huh.

9              MR. GERIES:  Is that a "yes"?

10             THE WITNESS:  Yes.  I'm sorry.

11             MR. GERIES:  No.  That's okay.

12        Q    (By Mr. Ogle) You had indicated it's not

13   a common occurrence, if I remember correctly, to

14   have inmates naked and with feces on their

15   person; correct?  That's not a common

16   occurrence?

17        A    Yes.

18        Q    What protocol or what steps would be

19   taken or are taken in 2016 to rectify that

20   situation?

21        A    Move them to a medical observation cell,

22   clean them up, start watching them to see why

23   they're doing that, see if it's a normal

24   occurrence for them if they are acting strange

25   for a reason, things like that.

1      Q    What if it occurs in the medical

2  observation area?  What would be done by jail

3  staff?

4      A    Advise a nurse; if they're non-violent,

5  try to clean them up; keep an eye on them;

6  follow nurses' procedures.

7      Q    Is there anything else regarding your

8  interactions with Mr. Davis in April of 2016

9  that sticks out in your memory that we have not

10  already talked about?

11      A    No, sir.

12      Q    Your primary encounter with him was

13  placing him in the restraint chair per protocol

14  with other individuals or staff?

15      A    Yes.

16      Q    Were you involved in moving him from the

17  chair?

18      A    No.  I would have been off shift.

19      Q    How do you know you were off shift?

20      A    In my report, it says at midnight -- 15

21  minutes after midnight, he would have been

22  removed, and I would have been off shift at

23  midnight.

24      Q    Because you would have gone on at 2200

25  hours and you would --



1        A    I would have gone on at 1600 and off at

2    midnight.

3        Q    Perfect.

4        A    It was 15 minutes after midnight, his

5    removal.

6        Q    Let's home everything in, now, to June

7    of 2016.  We touched on it earlier.  You came on

8    shift at approximately 1600 hours on June 5th;

9    is that correct?

10       A    Yes.

11       Q    If I represent to you that that's a

12   Sunday, do you have any reason to believe it

13   wasn't a Sunday?

14       A    No, sir.

15       Q    During that time period, Sunday was your

16   first day on shift?

17       A    Yes.

18       Q    So you probably didn't have any contact

19   with him because you would have not worked since

20   last Thursday; correct?

21       A    Correct.

22       Q    Sunday, Monday, Tuesday, Wednesday,

23   Thursday?

24       A    Yes.

25       Q    Mr. Davis may have been in the facility

1    on the 31st, but you don't have any independent

2    recollection of dealings with him?

3        A    Correct.

4        Q    Was this during a time period, if you

5    know, on the June 5th, that you were the top dog

6    or the top supervisor within the facility?

7        A    Yes.  I was a main supervisor at the

8    time.

9        Q    So Sergeant Fisher was not available or

10   was not on duty?

11       A    He was off that day.  Yes, sir.

12       Q    Okay.  If you can, describe your

13   encounter with Mr. Davis on June 5, 2016.

14       A    From the beginning?

15       Q    Yes, sir.

16       A    With him, it was just after 1600, if I

17   remember correctly.  Myself and Deputy Henderson

18   were told by Sergeant Ellison that a female

19   across the way was having some issues but was

20   being released, and Mr. Davis was also acting

21   strange and violent, but he was in Ida 11 for

22   observation.  We saw him in there, Deputy

23   Harrison.

24       Q    Harrison or Henderson?

25       A    Or Henderson.  Made contact with him.  I



```
 1   left to continue releases.  The next contact was

 2   when we tried to feed the area.  He wouldn't

 3   take his tray.

 4        Q   I'm going to try to back you up a little

 5   bit.  So if I understand right, it's shortly

 6   after you get on duty?

 7        A   Uh-huh.

 8            MR. GERIES:  Is that a "yes"?

 9            THE WITNESS:  Yes.  I'm sorry.

10            MR. GERIES:  That's okay.  You'll get

11   it.

12        Q   (By Mr. Ogle) You are doing great.

13   Don't worry about it.  He's just picking on you.

14            There was a female inmate in the same

15   pod that you identified Mr. Davis was in, I pod;

16   correct?

17        A   It's the booking area.

18        Q   Was she in a cell?

19        A   Opposite cell, yes.

20        Q   Were you dealing with the female inmate,

21   and Mr. Henderson was trying to deal with

22   Mr. Davis?  I'm confused.

23        A   Sergeant Ellison was in there, also, and

24   advised us, if I remember correctly, and started

25   changing out the female inmate as myself and
```



 1   Deputy Henderson went to check the rest of the

 2   areas out.

 3        Q    Was there anything special going on with

 4   the female inmate that you remember?

 5        A    She was on the floor unclothed.  It's

 6   also a medical observation cell.  She was acting

 7   strange, also, if I remember correctly, and

 8   that's why we called Sergeant Ellison, a female,

 9   so she could be female contact on female contact

10   instead of using a male officer.

11        Q    And this is an inmate that you were

12   cutting loose or releasing?

13        A    We were releasing, yes.

14        Q    Was there concern that she had had

15   previous situations of seizures?

16        A    I believe she was prone to seizures,

17   also, is why she was in observation, sir.  Yes.

18        Q    And the reason I asked you, that's

19   something you had put in the report, that it

20   preceded by seizures?

21        A    If it's the inmate I remember, yes, sir.

22        Q    Ida 11 is the one that we've identified

23   Mr. Davis was in; correct?

24        A    Yes.

25        Q    And Henderson and you or just Henderson



1   checked on Mr. Davis?

2       A    We went originally.  Deputy Henderson

3   took over, and I left for the booking area to

4   release inmates.

5       **Q    There is a note in your report, not the**

6   **statement to the OSBI, that Henderson was**

7   **attempting to communicate with Davis.  What do**

8   **you mean by "attempting to communicate"?**

9       A    When I left, he was knocking on the

10  window, talking to him.  So he was mumbling, I'm

11  sure, because Deputy Henderson was responding.

12      **Q    So you weren't able to observe or were**

13  **you able to observe if Davis was responding or**

14  **not responding?**

15      A    I was not able because I left for the

16  book-in area.

17      **Q    At this time, were you aware that**

18  **Mr. Davis was in the nude or unclothed?**

19      A    I was advised by Sergeant Ellison that

20  he was.

21      **Q    Ellison?**

22      A    Uh-huh.  That was the female officer

23  that was --

24      **Q    Had she had contact with Davis as well?**

25      A    For the day, yes.



```
 1              MR. GERIES:  I object to the form.

 2              THE WITNESS:  Unknown.  I would have to

 3     ask.

 4        Q    (By Mr. Ogle) I'm just going to read

 5     something from your report.  "After calling

 6     Mr. Davis by name and knocking on the door

 7     several times with no response, we noticed he

 8     was lying on his right side, facing the cell

 9     window, with his eyes closed."  Is that --

10        A    Is that when we were feeding, sir?

11        Q    Yes, sir.

12        A    Yes.

13        Q    Okay.  So that's when you did physically

14     observe him?

15        A    Yes.  And he looked like he was finally

16     resting and sleeping.

17        Q    Had you ever seen him in any condition

18     on June 5, 2016, that he was not laying on the

19     floor?

20        A    He would lay on the floor and he would

21     walk around, from what I was advised.

22        Q    Who advised you of that?

23        A    Sergeant Ellison had passed on.

24        Q    Where was Sergeant Ellison getting that

25     information, if you know?
```

1        A    Yes.

2        Q    Did she tell you that, "He's naked and

3   unresponsive in the cell"?

4        A    She told me he was naked.

5        Q    You had indicated you would like to see

6   your report.  I'm going to give you what was

7   provided to me through discovery, through the

8   discovery process, which purports to be a June

9   5, 2016, report of the Canadian County Detention

10   Center, if you want to review that just to

11   refresh your memory.  Before I ask you a

12   question, I would be happy to put it on hold for

13   a second.

14        Does that help refresh your memory, at

15   least to what you memorialized back on or about

16   June 5, 2016?

17        A    A little bit.

18        Q    Is it a fair statement that after

19   calling and knocking on the door several times,

20   Mr. Davis was nonresponsive?

21        MR. GERIES:  I object to the form.

22        THE WITNESS:  At the time of feeding,

23   yes.

24        Q    (By Mr. Ogle) And you noticed that he

25   was laying on his left side, facing the window,



1     A    Yes, sir.

2     Q    So I'm trying to get what your memory

3  tells you today, not necessarily what this

4  document says.

5          I can read really, really well, but I'm

6  interested in your memory.  So that's what I'm

7  trying to distinguish and was willing to you let

8  you read this so you could refresh your memory.

9  So I'm trying to get what you remember happening

10  when you went in there to give the tray.  Fair?

11     A    Okay.

12     Q    I just don't want you to think I'm

13  playing games or tricking you.  I'm really not.

14          So what was it that made you decide to

15  breach the door to enter Ida 11?

16     A    Since he didn't get up to get his tray,

17  I decided to go back with another officer, enter

18  the cell.  We knew he had been violent and

19  fighting officers, so I didn't want to go alone.

20     Q    Now, you knew that, or you had been told

21  that he had fought officers?

22     A    Had been advised that.

23     Q    Okay.  And that was from Ms. Ellison,

24  nobody else?

25     A    Yes.



1     Q    Okay.

2     A    And so I wanted to be safe on all

3  accounts.

4     **Q    Because you hadn't observed anything in**

5  **the two hours you had been on shift, either by**

6  **camera or visual, of any activity, much less**

7  **violence, by Mr. Davis; correct?**

8     A    Not what I had seen.  He had been

9  sleeping.

10    Q    Nonresponsive?

11       MR. GERIES:  I object to the form.

12       THE WITNESS:  Possibly sleeping,

13  nonresponsive.  People can still be violent.

14    **Q    (By Mr. Ogle) When you entered into the**

15  **room, what did you do first?**

16    A    I entered the cell, called his name

17  aloud to see if he could wake up.  He wasn't

18  waking up; it didn't look like it.  So I

19  attempted to see if he was faking asleep, if he

20  was going to try and attack or anything.

21       There's ammonia capsules which help

22  people wake up normally.  They can't ignore it.

23  He didn't make a response on it.  The nurse had

24  told us to try a sternum rub on people.  So I

25  attempted a sternum rub.  He did not respond.



1  The officer with me, I sent him to get little

2  pulse-ox checker thing.  I put it on his finger.

3  It was giving high and low numbers.  So I sent

4  the officer to get the AED.  He came back,

5  hooked it up, followed the instructions.

6      Q   So I want to make sure I'm recapping.

7  **You enter the room.  He's nonresponsive to**

8  **verbal command; correct?**

9      A   Uh-huh.

10     Q   **You observed his eyes closed but his**

11 **mouth open; correct?**

12     A   Uh-huh.

13         MR. GERIES:  Is that a "yes"?

14         THE WITNESS:  Yes.  Sorry.

15         MR. GERIES:  That's okay.  I just want

16 to be clear.

17     Q   **(By Mr. Ogle) During that time period,**

18 **before or after, did you ever do a sternum rub?**

19     A   After the ammonia capsule, I believe I

20 tried the sternum rub, when we rolled him over.

21     Q   **And he was nonresponsive to a sternum**

22 **rub; correct?**

23     A   Yes.

24     Q   **In fact, you had told the officer that**

25 **he was "kind of cold to the touch," being the**



1    Q    Is it common practice to deliver meal

2    trays, which it looks like what's in Henderson's

3    hand, deliver those in twosomes?

4    A    If we've been advised that inmates are

5    violent and acting strange, yes, just for

6    safety.

7    Q    You said violent and acting strange.

8    Would you do it if it was just acting strange or

9    just if it was violent?  Because I see those as

10   different.  That's why I'm asking.

11   A    Both.

12   Q    Because your intent is to hand this

13   through the peephole or the bean hole; correct?

14   A    The food slot, yes.

15   Q    So are you opening it now?

16   A    Yes.

17   Q    In fact, you can see it show up on the

18   other camera, can't you?

19   A    Yes.

20   Q    With a little white tray sitting there?

21   A    Yes.

22   Q    Do you believe you are talking to him at

23   this time, trying to get him to take his food as

24   you testified earlier?

25   A    We are asking his name, "Hey, Anthony



 1   Davis.  Here is your dinner tray.  Do you want
 2   to eat tonight?"
 3        They're allowed to refuse.
 4   Q    I'm a little confused.  How is this
 5   different than your encounter with him at 1630?
 6   A    This one, he didn't -- there were no
 7   mumps, no grumbles, like we had just woken him
 8   up, anything like that.  So we didn't know if he
 9   was fully asleep.  Inmates can sleep pretty
10   thoroughly sometimes, so I was not too worried
11   at this time.
12   Q    And you are seen leaving or starting to
13   leave the room.  Do you know what you are doing
14   there where you're pointing to the sky?
15   A    The control officer, when you hit the
16   button, they pull up the camera, and you kind of
17   point where you want to go.
18   Q    Gotcha.
19   A    So they know where you are trying to go.
20   Q    What do you believe you are doing there?
21   A    I decided I was going to go find an
22   ammonia capsule and see if we could wake him up,
23   if he was sleeping, and he was asking if I
24   wanted him to stay there or what I wanted him to
25   do.



```
 1        Q    Are you and Henderson friendly outside
 2   of your capacity in 2016 at the Detention
 3   Center?
 4        A    No.
 5        Q    When I say "friendly," do you go out to
 6   dinner together?
 7        A    No, sir.  We don't really hang out, no.
 8        Q    Back in 2016.  I'm not asking about
 9   today, but --
10        A    No, sir, not back then.
11        Q    I was trying to get it to skip forward a
12   little bit.  This was when you were getting the
13   smelling salts?
14        A    Ammonia capsules?
15        Q    Yes.
16        A    Yes.
17        Q    You guys are back at the door now.  Is
18   that you that went in there and had contact with
19   him?
20        A    Yeah.  That's Officer LeBeau and myself
21   that tried the ammonia first.
22        Q    This is where you testified he was
23   nonresponsive?
24        A    Yeah.  That's trying the pulse-ox thing.
25        Q    Now you're rubbing the sternum?
```

```
 1        A    Yes.  It looks like it.

 2        Q    If you had told the OSBI agent that he

 3   was lukewarm to the touch or not normal warm,

 4   this is the times that you were touching him

 5   that that would have come from?

 6        A    More than likely.  And I was telling him

 7   to get the AED and where to get it.  That's why

 8   I was pointing.

 9        Q    Is this an occurrence that in June of

10   2016 that you had been faced with before,

11   somebody who was having no pulse, no response to

12   ammonia, no response to sternum, meaning,

13   somebody who has died or dying in your presence?

14        A    Yes.

15        Q    This was your first occasion?

16        A    No, sir.

17        Q    How many occasions have you been in this

18   circumstance?

19        A    I think there's two.

20             MR. GERIES:  I object to the form.

21        Q    (By Mr. Ogle) Two times?

22        A    Yes.

23        Q    And the other one was prior to this?

24        A    Yes.

25        Q    Was that in Canadian County or Oklahoma
```



1    County?

2        A    Oklahoma County.

3        Q    Were you able to conduct life support,

4    lifesaving effort, on the prior incident?

5        A    It was a homicide.  No.

6        Q    At some point, do you make a

7    determination that maybe we've got to get EMSA

8    or somebody else out here?

9        A    Myself and Officer Brown were

10   communicating about that.

11       Q    How were you communicating with Officer

12   Brown?

13       A    There is a little inspector right there

14   that you can touch it.  There is a little

15   speaker right next to that door.  (Indicating)

16       Q    So you've got to come out to talk to

17   him.  So you're really not talking to him now.

18   You don't have a walkie-talkie or anything like

19   that when you're communicating with him?

20       A    I may have had a radio, but we were

21   forestalling that because we had things on our

22   gloves, feces, and we didn't want to --

23       Q    What is that light?  That light thing

24   was going off pretty heavy.  What are you all

25   doing there?

1    A    He's trying to turn his flashlight down

2    lower to move in front of the eyes.  We didn't

3    want it really, really bright, and we don't want

4    strobe, because you can't tell anything from

5    those.

6        Q    And I think you had reported his eyes

7    were unresponsive?

8        A    Yeah.  I don't think they were moving.

9        Q    Were there any signs of life when you

10   were doing all of this, trying to save the man?

11       A    I can't pronounce that.  I'm not a

12   doctor.

13       Q    Did you see anything as a layperson and

14   a person who --

15       A    The pulse-ox was giving a lot of

16   heartbeats and was giving oxygen still.

17       Q    45 percent oxygen and 222 pulse rate?

18       A    Uh-huh.

19            MR. GERIES:  Is that a "yes"?

20            THE WITNESS:  Yes.  I'm sorry.

21            MR. OGLE:  Let's take about a two-minute

22   break, and I think we're done, if that's all

23   right.

24            MR. GERIES:  Great.

25            (Break from 11:01 a.m. to 11:13 a.m.)



```
 1        Q    In fact, you have done training for

 2  new jailers on the completion of medical

 3  questionnaires; correct?

 4        A    I've showed them that, yes, sir.

 5        Q    When you do the medical questionnaire,

 6  do you rely on the inmate to truthfully answer

 7  your questions?

 8        A    Yes, sir.

 9        Q    And you just transcribe whatever they

10  tell you, as far as their response, into the

11  medical questionnaire; correct?

12        A    Yes, sir.

13        Q    Each year since you have worked here in

14  Canadian County, you have gone through jailer

15  training; correct?

16        A    Refresher training, yes, sir.

17        Q    Okay.  And that jail training consists

18  of approximately 25 hours each year of different

19  training; correct?

20        A    Approximately, yes, sir.

21        Q    And that would include security

22  procedures; is that accurate?

23        A    Yes, sir.

24        Q    Does it include supervision of

25  prisoners?
```



```
 1      A   Yes, sir.

 2      Q   Report writing and documentation?

 3      A   Yes, sir.

 4      Q   Prisoner rules and regulations?

 5      A   Yes, sir.

 6      Q   Grievance and disciplinary procedures?

 7      A   Yes, sir.

 8      Q   Rights and responsibility of inmates?

 9      A   Yes, sir.

10      Q   Emergency procedures?

11      A   Yes, sir.

12      Q   And you have first-aid and CPR every

13 year; correct?

14      A   We have to get certified every year,

15 yes, sir.

16      Q   You also have training on Oklahoma Jail

17 Standards?

18      A   Yes, sir.  We get tested on it.

19      Q   And you also have training on the

20 policies and procedures of the jail; correct?

21      A   Yes, sir.  Anything that normally

22 updates something, when they update the policies

23 and procedures.

24      Q   You have a copy of the policies and

25 procedures since you were hired at the jail;
```

1    correct?

2         A    Yes, sir.

3         Q    You were personally provided with your

4    own copy?

5         A    Yes, sir.

6         Q    Is there also a copy in the jail that

7    the jailers can look at?

8         A    Yes, sir.  It's on the server, so

9    anybody can access it.

10        Q    They can access it at any time; correct?

11        A    Yes, sir.

12        Q    You also talked about conversations that

13   you had with a nurse about ammonia packets and

14   sternum rub.  So you have had additional times

15   where you could ask the nurse for different

16   procedures and ways to treat inmates as they

17   were in the jail; correct?

18        A    Yes, sir.  The nurses are real helpful.

19   If you have questions, they can explain things

20   to you.

21        Q    You talked about the button that was

22   inside the I-11 cell, that there was a button on

23   the wall?

24        A    Yes, sir.

25        Q    That button that's inside the cell, when

1    an inmate pushes that button, tell me what

2    happens.

3        A    The officer that's working in the

4    booking area goes out and checks on them and

5    tells them what time it is, who it is, whatever

6    they ask.

7        Q    When they actually push the button, is

8    there a -- there is no intercom inside the cell;

9    is that correct?

10       A    No, sir.

11       Q    So when they push the button, does it

12   light up somewhere or there is a notification?

13       A    There is a light that turns on and it

14   sends out a beep.

15       Q    That light and that beep, does it

16   indicate what cell in which that button was

17   depressed?

18       A    Yes.

19       Q    Is it the policy of the Canadian County

20   Detention Center that when that button is pushed

21   that a jailer has to respond to the cell and see

22   what's going on?

23       A    Yes.

24       Q    That button can be pushed for any

25   reason; correct?



```
 1       A    Yes.

 2       Q    Tell me some of the reasons that you are

 3  familiar with why inmates might push that

 4  button.

 5       A    They want to know what time it is,

 6  toilet paper.  They are mad about not getting

 7  two sandwiches when they think they should have

 8  gotten one (sic) or something.  Anytime, they

 9  hit it all day.

10       Q    So anytime they have a question?

11       A    Yes, sir.

12       Q    So if they want to know what their bond

13  is, they might push the button?

14       A    Yes, sir.

15       Q    If they want to know what's for dinner,

16  they might push the button?

17       A    Yes, sir.

18       Q    If they want to know what the time is,

19  they might push the button?

20       A    Yes.

21       Q    Is it accurate that the jail has a

22  medical request policy?

23       A    Yes, sir.  It's a sheet.

24       Q    It's a sheet.  If an inmate requests a

25  medical request sheet, are they provided it?
```

