```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF OKLAHOMA
 2


 3    ESTATE OF ANTHONY KADE DAVIS, on
      behalf of the deceased, ANTHONY KADE
 4    DAVIS,

 5         Plaintiff,

 6    vs.                    Case No. CIV-17-807-SLP

 7    (1)  THE SHERIFF OF CANADIAN COUNTY,
      a political subdivison, and
 8    (2)  THE BOARD OF COUNTY COMMISSIONERS
      OF CANADIAN COUNTY, a political
 9    subdivision,

10         Defendants.


11


12            DEPOSITION OF CAMERON T. HENDERSON
               TAKEN ON BEHALF OF THE PLAINTIFF
13       ON OCTOBER 26, 2018, BEGINNING AT 1:54 P.M.
                 IN OKLAHOMA CITY, OKLAHOMA
14


15                       APPEARANCES

16    On behalf of the PLAINTIFF:

17    J. David Ogle
      Erika Schwink
18    BABBIT, MITCHELL & OGLE
      9905 S. Pennsylvania Ave.
19    Oklahoma City, OK  73159
      (405) 692-7676
20    david@oglelaw.com

21    On behalf of the DEFENDANT:

22    Stephen L. Geries
      COLLINS, ZORN & WAGNER
23    429 N.E. 50th Street, Second Floor
      Oklahoma City, OK  73105
24    (405) 524-2070
      steve@czwglaw.com
25    REPORTED BY:  SUSAN K. McGUIRE, CSR, RPR
```

1    WHEREUPON,

2                    CAMERON T. HENDERSON

3    after having been first duly sworn, deposes and says

4    in reply to the questions propounded as follows,

5    to-wit:

6                    DIRECT EXAMINATION

7    BY MR. OGLE:

8        Q.    Mr. Henderson, could you please state your

9    full name and your age, for the record.

10       A.    Cameron Timothy Henderson, 27 years old.

11       Q.    And what year does that make you born in?

12       A.    1991.

13       Q.    1991.  Have you ever had the opportunity to

14   be deposed?

15       A.    No.

16       Q.    Have you ever had the opportunity to testify

17   in a courtroom under oath?

18       A.    No.

19       Q.    Do you understand what the court reporter

20   just did when she asked you to raise your hand?

21       A.    To tell the truth.

22       Q.    And would you agree with me that telling the

23   truth means to tell the full truth and all the truth?

24       A.    Yes.

25       Q.    Would you consider it a false statement, or



 1    midnight to 6:00 A. -- 8:00 a.m., I believe.

 2          Q.    And then you have 8:00 a.m. to 4:00 p.m.?

 3          A.    Yeah, that would be it, 8:00 a.m. to 4:00,

 4    so I worked 4:00 to midnight.

 5          Q.    So you came on duty on June 5th, if that's

 6    the date of his death, did you come on duty at 4:00 on

 7    that day?

 8          A.    No, I came on at 4:30, at or about 4:30, I

 9    came in late that day.

10          Q.    Let me ask you this, what have you used, if

11    anything, to prepare for your deposition today, what

12    have you done?

13          A.    What have I done?

14          Q.    Yes, sir.

15          A.    I've just reviewed my reports and that's

16    about it.

17          Q.    Did you have the opportunity to review any

18    video?

19          A.    Oh, yes, I reviewed video, yesterday.

20          Q.    And with whom did you review that video?

21          A.    With my attorney.

22          Q.    Okay.  And when you say "your attorney"

23    Steve to your left?

24          A.    Yes.

25          Q.    Okay.  In reviewing your report is there



1    **anything from that report that doesn't seem right or**

2    **that you have any questions about now, meaning, would**

3    **you want to correct or change anything?**

4         A.    The only thing that I think I would correct

5    or change would be when I kicked the door seeing him

6    move his legs, I believe after reviewing the video

7    that I had gotten my times mixed up.

8              And that would have been a different

9    instance of me looking in on him.  Plus, I mean, doing

10   something, writing the report days after something

11   occurs, it's hard to get everything and the

12   recollection and all in the right order.

13        Q.    **I may be paraphrasing, what you're saying is**

14   **you would defer your memory to the video?**

15        A.    Some, yes.

16        Q.    **Meaning that if you had had the video to**

17   **review at the time you were generating your report it**

18   **might be different because the memory, the video is**

19   **probably clearer than your memory?**

20        A.    Correct.

21        Q.    **Fair enough.  When was it, if you remember,**

22   **that you were asked to generate the report that you**

23   **have reviewed in preparation for today?**

24        A.    Like when did I write it?

25        Q.    **Yes, sir.**



```
 1   a little bit.

 2         Q.    Maybe I'll ask you, when you say "assigned

 3   to pod" that's another division of a part of jail?

 4         A.    They have two separate pods which houses

 5   about 80 inmates each.  You have an Adam pod and a

 6   Baker pod.  There's no difference in them, it's just

 7   different housing is all.  I guess they would say

 8   minimum security, but it's called medium because

 9   minimum security I guess there's really no such thing.

10         Q.    And so you were --

11         A.    I was assigned to those, that was my duties

12   for that.

13         Q.    And who would have assigned duties for the

14   that day, do you remember?

15         A.    It would have been Corporal Staten.

16         Q.    Because he was the boss on property at the

17   time?

18         A.    Correct.

19         Q.    And you mentioned that you checked in or

20   looked in on IDA 11?

21         A.    Correct.

22         Q.    And that was the observation cell of

23   Mr. Davis at the time?

24         A.    Correct.

25         Q.    And were you aware at that time that you
```



1   checked on him that he was in medical observation?

2        A.   No.

3        Q.   When did you learn that he was in medical

4   observation?

5             MR. GERIES:  Object to the form.  Go ahead.

6             THE WITNESS:  Not really until things had

7   started to kind of kick off that, I believe it might

8   have been Sergeant Ellison who had informed me that he

9   was in some kind of medical observation.

10            I typically, when I walked in I usually, I

11   would walk in the door where IDA 9 is, IDA 11 is

12   because I always had to check my pistol in the lockbox

13   and I would always look in IDA 11, which we called it

14   our drunk tank too, just to see who's in there.

15            And that's when I saw him in there, laying

16   in there.

17        Q.   So if I have video that shows that at about

18   16:33:48, to be specific, so 4:33 and 48 seconds, that

19   you arrive and you look into the Anthony room, that

20   would be when you first came on and you've come in and

21   that's the first thing you happen to check, just your

22   habit to check the drunk tank?

23        A.   Correct.

24        Q.   Or that camera access room?

25        A.   Correct, just always just looking in those



 1    just to see who's where and what do we have, is there

 2    people in there that are waiting to be booked, or is

 3    there just people in there for general because

 4    typically we don't put people in there.

 5        Q.    And I think that's where the knocking with

 6    your boot may be occurring at a different occasion

 7    than on that occasion as indicated in your report?

 8        A.    Correct.

 9        Q.    Because that's not what shows up in video?

10        A.    Correct.

11        Q.    Is it during that time in that foyer area

12    outside of IDA 9 and 11 that you have discussion with

13    Staten and kind of get an understanding of what the

14    game plan is for your shift?

15        A.    That would have been in the booking area, is

16    usually where we would meet and discuss who's going to

17    work where, who's assigned to what area of the jail

18    that day.  Which the booking area is on the inside,

19    where you can see those two cells, 9 and 11, the

20    booking area is on the other side of that.

21        Q.    The other side of the door that you can see

22    you, or Ellison, or Staten come and go periodically?

23        A.    Yes, that's the booking area.

24        Q.    On the other side of the wall is the booking

25    area?



1    so that she could take her medicine, because she had

2    to take medicine and a lot of times she didn't want

3    to, she would refuse to.  So that's what we would have

4    been talking about.

5         Q.    And that's kind of consistent with what you

6    were saying earlier, you were working to get your

7    weekenders out?

8         A.    Correct.

9         Q.    And she was one of the ones that had to be

10   moved out?

11        A.    Correct.  She had a hard time moving, she

12   was in a wheelchair a lot of the times as well.

13        Q.    And so you were, when we see you standing in

14   the foyer area and Ellison is coming and going,

15   putting on gloves and things, that's when she's

16   working with the female inmate?

17        A.    Getting her dressed.

18        Q.    And you're just kind of there as a witness?

19        A.    Just hanging out.

20        Q.    Just doing your deal.  When is it next that

21   you remember having contact with Mr. Davis?

22        A.    It would have been while they were getting

23   Ms. Cooper taken care of, trying to get her released

24   is when I went and peeked in his window.

25        Q.    A second time, or the first time we talked



1      Q.    So the theory would have been whoever was

2    upstairs in the control room, or any other room, the

3    control room where all the cameras are, would put in

4    the log --

5      A.    Correct.  They're the ones who log on.  The

6    control person is the one who sits up there and they,

7    like when you're doing your sight checks and stuff

8    too, we have a book that we would write in outside of

9    the cell and then the control officer would witness

10    that and he would write it in the actual logbook as

11    well.

12         And then they have copies and copies of

13    those that they keep for, I don't know, forever, I

14    guess.

15      Q.    And you're saying that the control's

16    obligation is to log if they ate or if they refused?

17      A.    If they refused to eat the control officer

18    will log that, such and such refused chow and then

19    they go into the computer and there's a section in

20    OTIS where they can log that as well.

21         So it goes into a handwritten form just in a

22    notebook, a journal type deal and then into OTIS as

23    well.

24      Q.    So if the video reflects that in the last 26

25    hours that Mr. Davis was in that observation cell that



Case 5:17-cv-00807-SLP   Document 50-33   Filed 11/01/18   Page 10 of 13

1    he did not eat we should have corresponding logs

2    reflecting that he refused or did not eat, if

3    everybody's doing their job?

4         A.   Correct.  Now if there's a tray in there and

5    he takes the tray and he doesn't eat it, that's not a

6    refusal.  As long as he takes that tray that's him

7    accepting it.  If he says, I don't want it, I'm not

8    eating it, that's when it's a refusal, but as long as

9    he takes a tray, if it sets there, even if he doesn't

10   eat it, that's him accepting it.

11        Q.   At 14:33 you had a visual contact through

12   the hole looking at Mr. Davis; correct, when you first

13   came on duty?

14        A.   Yes.

15             MR. GERIES:  Object to the form.

16        Q.   (BY MR. OGLE)  You had a second interaction

17   when you open the bean hole and he refused by grunt

18   his food?

19        A.   Correct.

20        Q.   When was the next contact you had with

21   Mr. Davis?

22        A.   Probably at least an hour.  If I remember

23   correctly, I went and passed dinner trays to the pods

24   and that typically takes about 35 minutes to pass

25   trays to one pod.  So I mean, it could have been



1    my times mixed up and I think I can clarify that a lot

2    more.

3         Q.    Sure. Sure.  I think there were two

4    contacts.  There's one closer to 18:30 and there's one

5    closer to 16:30.  I apologize for the highlighting?

6         A.    Oh, no, you're fine.

7         Q.    That's just the way I do things.

8         A.    Let's see.  The second contact that I had

9    with him was when I attempted to give him his tray and

10   that's when Corporal Staten and I realized that there

11   was an issue.  Him and I then went and searched for

12   ammonia capsules, I couldn't find any in the booking

13   area, we call it the new jail side, so he had Trent

14   Labow (phonetic) go, who was working the old side of

15   the jail, find ammonia capsules.

16        And Corporal Staten instructed me to go feed

17   the pods.  So that would have been my second

18   interaction with Davis, when I was giving him his tray

19   and.  That's when Corporal Staten then went to go find

20   ammonia capsules and render aid to him.

21        Q.    18:30ish, whatever time frame that is that

22   you carry the tray in there, is kind of when it starts

23   to be recognized we might have a problem in IDA 11?

24        A.    Correct.

25        Q.    Going back to the first encounter when you



 1   members, either one of the firefighters or the EMT

 2   said, It's in his gut.

 3            And they pulled it out and there was blood

 4   and like a vomity looking substance with it.  And then

 5   they did it again and then that second time I think

 6   they were successful with getting the tubing, or

 7   whatever it was they were doing.

 8        Q.   In the time that you were in there did

 9   you -- did he ever gain consciousness.  On the second

10   visit was he ever conscious and coherent?

11        A.   On which time?

12        Q.   The second occurrence?

13        A.   No.

14        Q.   And on the first occurrence all you heard

15   was a grunt and him looking the other way because you

16   didn't see his face?

17            MR. GERIES:  Object to the form.

18            THE WITNESS:  I did see his face.

19        Q.   (BY MR. OGLE)  You did see his face?

20        A.   He was laying like this -- (Indicating).

21        Q.   Looking towards the door or away from the

22   door?

23        A.   I believe towards the door.

24        Q.   Was his left cheek or his right cheek on the

25   floor?


Professional Reporters
800.376.1006
www.proreporters.com

1          A.    Yes, sir.

2          Q.    In your training, we've got a stack of

3     policies here, did you go through a training process

4     to learn the policies and procedures of the detention

5     center?

6          A.    I went through the jail school, yes.

7          Q.    Was that a jail school for Canadian County

8     or a jail school for all jails?

9          A.    It was jail standards, I believe.

10         Q.    Did you have any independent training at

11    Canadian County relevant to their policies and

12    procedures?

13         A.    Yes.

14         Q.    And did you have a copy of those policies

15    and procedures?

16         A.    Yes, everyone was given a policy book.

17         Q.    Are there occasions during this time period

18    of say April to June of 2016, where you observed

19    policies and procedures not being followed?

20         A.    Not that I can think of.  I'm sure there is

21    some, but not that I can honestly say yes or no to.

22         Q.    If nursing and medical, there's medical

23    staff that's outside, in essence outside of the county

24    detention center; correct?

25         A.    What do you mean?

